LYONS, Justice
(dissenting).
I respectfully dissent. The per curiam opinion ignores Chief Justice Rehnquist’s description in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), of the three categories of regulation subject to the power of Congress under the Commerce Clause of the United States Constitution, and it fails to distinguish Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000).
Chief Justice Rehnquist in Lopez referred to the channels, instrumentalities, and activities having a substantial relation to commerce. We recognized these categories in Sisters of the Visitation.
The first category, regulation of the use of the channels of interstate commerce, involves management of the avenues of commerce and control over the items that might move through them, such as intoxicating liquors, convict-made goods, and *470 stolen goods. Lopez, 514 U.S. at 558-59, 115 S.Ct. 1624. See, also, Gibbs v. Babbitt, 214 F.3d 483 (4th Cir.2000) (“The term ‘channel of interstate commerce’ refers to, inter alia, ‘navigable rivers, lakes, and canals of the United States; the interstate railroad track system; the interstate highway system; ... interstate telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies).’ ” 214 F.3d at 490-91 (quoting United States v. Miles, 122 F.3d 235, 245 (5th Cir.1997), cert. denied, 523 U.S. 1011, 118 S.Ct. 1201, 140 L.Ed.2d 329 (1998)).
The second category, regulation of the instrumentalities of interstate commerce, protects things in interstate commerce, for example, by regulating the safety of motor vehicles. Lopez, 514 U.S. at 558-59, 115 S.Ct. 1624; Gibbs v. Babbitt, 214 F.3d at 491. That an item may move in interstate commerce does not make it an instrumentality, or else the weapons shipped in interstate commerce giving rise to violations of the Gun Free School Zones Act of 1990 would have sufficed to place 18 U.S.C. § 922(q), which was before the Supreme Court in Lopez, in the category of regulation of instrumentalities of commerce.
Based upon the illustrations given in Lopez dealing with the three categories, I conclude that the delivery of newspapers is not a channel of interstate commerce or an instrumentality of interstate commerce. A contract is neither a channel nor an instrumentality, but suggests instead an activity. The Federal Arbitration Act requires arbitration of “a contract evidencing a transaction involving commerce,” 9 U.S.C. § 2, and it defines “commerce” as “commerce among the several States or with foreign nations,” 9 U.S.C. § 1. This case, therefore, falls in the third Lopez category, dealing with activities; therefore, as was held in Lopez, to be subject to regulation by the Congress, the activity must have a substantial effect on interstate commerce.
In order to decide the questions these plaintiffs present, we must, just as we did in Sisters of the Visitation, confront Wick-ard v. Filbum, 317 U.S. Ill, 63 S.Ct. 82, 87 L.Ed. 122 (1942), where the Supreme Court upheld the constitutionality of regulation of homegrown wheat pursuant to an act of Congress controlling prices of wheat. In Lopez, the Court referred to Wickard as “perhaps the most far reaching example of Commerce Clause authority over intrastate activity.” 514 U.S. at 560, 115 S.Ct. 1624. Recently, in United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Court stated: “[I]n every case where we have sustained federal regulation under Wick-ard ⅛ aggregation principle, the regulated activity was of an apparent commercial character.” 529 U.S. at 611 n. 4, 120 S.Ct. at 1750 n. 4 (emphasis added). The Court’s describing Wickard as “the most far reaching example” and its referring to “Wickard ⅛ aggregation principle” suggest that Wickard is not a standard to be trotted out and applied willy-nilly whenever Congress attempts to regulate activities in interstate commerce. At stake in Wickard was Congress’s attempt to control prices.
The aggregated effect of a determination that the activity in Wickard was wholly intrastate would have frustrated the Congressional purpose for controlling the price of wheat. In Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), and Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3d Cir.), cert. denied, 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959), the two antitrust cases relied on by the per curiam opinion, the relevant Congressional scheme was to prevent monopolies and restraints of trade. In Evening News, the United *471 States Court of Appeals for the Third Circuit observed:
“The end result, the distribution of the News, as a complete newspaper containing those news items and advertisements, to its reading public in Newark or any other New Jersey area is, as the Court held in Lorain (342 U.S. at page 152, 72 S.Ct. at page 185), ‘ * * * an inseparable part of the flow of the interstate commerce involved.’ That Court said further (342 U.S. at page 152, 72 S.Ct. at page 186), ‘Without the protection of competition at the outlets of the flow of interstate commerce, the protection of its earlier stages is of little worth.’ ... It should be noted that in Lorain, as here, the contention was that merely a local issue was in dispute.”
263 F.2d at 717-18 (“outlets” emphasized in Evening News; additional emphasis added).
We here deal with the Federal Arbitration Act, a statute requiring arbitration of contracts involving interstate commerce. I do not consider a statute whose purpose is to control wheat prices across the country or a statute whose purpose is to protect competition to be interchangeable with a statute authorizing arbitration. Both the FAA and the antitrust statute are grounded in the authority conferred upon Congress by the Commerce Clause, but the nexus between the applicability of the statute to local transactions and the fulfilment of the Congressional scheme is not nearly as direct or logical in the context of a statute calling for arbitration of disputes arising from contracts involving interstate commerce as it is in the context of a statute establishing price controls or regulating competition.[2] The case for applying “Wickard ⅛ aggregation principle” is therefore not as compelling in regard to the FAA as it is in regard to statutes purporting to control prices or prevent monopolies.
How, then, do we strike a balance that respects Congress’s authority and upholds the rights of states over local matters? The United States Court of Appeals for the Fourth Circuit discussed this issue in Gibbs v. Babbitt, dealing with the constitutionality of an act regulating the taking of red wolves on private land, as follows:
“Lopez and Morrison rest on the principle that where a federal statute has only a tenuous connection to commerce and infringes on areas of traditional state concern, the courts should not hesitate to exercise their constitutional obligation to hold that the statute exceeds an enumerated federal power. Respect for our federal system of government was integral to those decisions. See Lopez, 514 U.S. at 561 n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626; Morrison, [529 U.S. at 617-18,] 120 S.Ct. at 1754-55. Yet Lopez also counsels that ‘[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.’ 514 U.S. at 560, 115 S.Ct. 1624, 131 L.Ed.2d 626. In enforcing limits on the Congress, we must be careful not to overstep the judicial role. To strike down statutes that bear substantially upon commerce is to overstep our own authority even as we fault Congress for exceeding limits on its power. The irony of disregarding limits on ourselves in the course of enforcing limits upon others *472 will assuredly not be lost on those who look to courts to respect restraints imposed by rules of law.”
214 F.3d at 491-92.
I would strike the balance by relying upon the standard we set in Sisters of the Visitation, a standard that allows us to focus intensely on the specific transaction before the Court. While that standard considers other interstate contracts of one of the parties that operate in proximity to the contract before the Court (“proximity contracts”), it avoids automatically concluding that proximity to interstate contracts alone warrants the conclusion that the subject contract substantially affects interstate commerce. We held in Sisters of the Visitation, after creating a hypothetical transaction involving a farmer mowing pasture lands, a transaction that lacked a substantial effect on interstate commerce, as follows:
“This hypothetical transaction — an agreement by the farmer to do work for another local landowner — might contain the following components: (1) a contract solely between two local parties, both of them engaging in activities that do not involve any person or entity in another State; (2) tools and equipment, which, although they moved in interstate commerce, were not purchased or leased solely for the farmer to perform the particular contract at issue; (3) substantially more than half of the amount paid to the farmer by the other landowner is allocable to the cost of the services rendered by the farmer, who renders those services without using persons or entities from another State, while substantially less than half of the amount paid is allocable to the cost of materials specially purchased for use or consumption in the farmer’s performance of the contract; (4) the object of the services is incapable of subsequent movement across State lines or otherwise having a subsequent substantial effect on interstate commerce; (5) such a degree of separability from any contracts that are subject to the FAA that allowing this contract to remain outside the scope of the Act would not substantially disrupt activities that Congress intended to be subject to the Act.”
775 So.2d at 765. In the situation of the plaintiffs now before us, we have no material deviation toward interstate commerce from the hypothetical transaction described above.
In each of the two cases before us, the parties to the transaction are local, but one party, The News, is engaged in an activity that involves numerous contracts between it and out-of-state entities that provide a range of materials and services, including comics, Parade magazine, advertising inserts, news content, photographs, paper, and ink. Some of the printed materials expressly solicit interstate business transactions between advertisers and subscribers. The Dealers purchase polyethylene bags and rubber bands from The News. The News obtains these products from outside the State of Alabama. We, therefore, have a deviation toward interstate commerce from the hypothetical transaction based upon the relationship of the parties to other contracts, to which I will return later.
The News makes no showing as to whether equipment, such as delivery trucks and other vehicles necessary to perform the distribution contracts, moved in interstate commerce to the Dealers or were acquired for performance of this contract and used solely in performance of the contract. We have no deviation toward interstate commerce from the hypothetical transaction based upon equipment necessary for the performance of the contract.
*473 The News makes no showing as to the breakdown between the cost of local labor versus the cost of materials of interstate origin, such as equipment and gasoline necessary to the performance of the contract. We have no deviation toward interstate commerce from the hypothetical transaction based upon the costs attributable to interstate, as opposed to local, activity.
The newspapers subject to the contract are delivered locally. Any subsequent entrance into interstate commerce as a result of a local subscriber’s mailing a clipping to another state is too incidental to warrant further consideration. The subscriber could respond to a solicitation for sale of a product from outside Alabama. However, we have no evidence as to the extent of such activity. We have no deviation toward interstate commerce from the hypothetical transaction based upon subsequent effect on interstate commerce.
The aforementioned proximity contracts are not linked to a showing that litigation, as opposed to arbitration, in connection with The News’s contract with the Dealers, would disrupt performance of those proximity contracts with third parties. Indeed, we have no basis on which to conclude that the parties or potential witnesses to these proximity contracts have anything to do with the contract between The News and the Dealers. We have no deviation toward interstate commerce from the hypothetical transaction based upon disruption of proximity contracts with third parties.
The most difficult portion of the test is determining the effect of the proximity contracts and the Dealers’ purchases from The News of materials that it obtains from outside Alabama. The materials resulting from the proximity contracts come to rest in Alabama, where The News processes and assembles the completed product. The advertising inserts do not move directly between the Dealer and the merchant purchasing the advertising. While the contract requires the Dealers to deliver the inserts, that activity is local. The rubber bands and polyethylene bags sold by The News to the Dealers come to Alabama and then are resold by The News to the Dealers. However, there is no indication that the dispute between the parties relates to the sale of these products.
Unquestionably, The News substantially affects interstate commerce in the performance of its proximity contracts. However, the separate contract for the distribution of newspapers affects interstate commerce only to the extent that (a) the contract requires involvement by the Dealers in interstate commerce to perform the contract for distribution, or (b) the distribution itself causes subscribers to purchase goods or services directly from outside Alabama. Based on the absence of evidence to quantify interstate activity in these areas, I am unable to conclude that the performance of the contract between the Dealers and The News has the requisite substantiality of effect on interstate commerce to justify applying the Federal Arbitration Act. To hold otherwise would assume that the framers of the United States Constitution intended that Congress could require arbitration of a contract between a local newspaper and a young person in the neighborhood who throws papers from his or her bicycle.
I must dissent, lest we give too much weight to the interstate activity of The News and thereby disregard the proper focus on the contract between The News and the Dealers and the question whether that contract substantially affects interstate commerce.
COOK, J., concurs.

. Justice Houston's special concurrence attempts to distinguish Sisters of the Visitation on the ground that it has no applicability in a case “involving an activity in which the flow of commerce must continue in order to fulfill the purpose of the activity.” 786 So.2d at 469. I respectfully submit that such reasoning erroneously conflates the purpose of the statute and the purpose of the activity.